UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| NICOLE BECKER GRANDSTAFF,<br>*Plaintiff*,<br><br>v.<br><br>ANDREW W. SAUL, Commissioner of the<br>Social Security Administration,<br>*Defendant*. | Civil No. 1:19-cv-0384-TSE-MSN |

## REPORT AND RECOMMENDATION

This matter comes before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 14 and 17). Plaintiff Nicole Becker Grandstaff seeks judicial review of the final decision of defendant Andrew W. Saul, Commissioner of the Social Security Administration, denying her claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423 (the "Act"). Alternatively, plaintiff moves for an order remanding the instant appeal to the Social Security Administration ("SSA") for a new administrative hearing pursuant to § 405(g). For the reasons stated below, the undersigned recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 14) be DENIED, defendant's Cross-Motion for Summary Judgment (Dkt. No. 17) be GRANTED, and defendant's final decision be AFFIRMED.

**I.    Procedural and Factual History**

Plaintiff applied for disability insurance benefits on May 4, 2014, alleging disability beginning April 9, 2014. Administrative Record ("AR") at 88, 99. Plaintiff's application was denied both initially and again upon reconsideration. At plaintiff's request, a hearing was held on March 16, 2017, before Administrative Law Judge ("ALJ") Karen Robinson. *Id.* Both plaintiff, represented by an attorney, and a Vocational Expert ("VE") testified. *Id.* at 61-87. On June 29,

2017, the ALJ issued a decision finding that plaintiff was not disabled. *Id.* at 41-56. On July 8, 2018, the Appeals Council for the Office of Disability and Adjudication denied plaintiff's request for further administrative review and notified her that the ALJ's decision stood as the Commissioner's final decision. *Id.* at 12-18.

Having exhausted her administrative remedies, plaintiff filed a Complaint (Dkt. No. 1) on April 2, 2019, challenging the ALJ's decision.[1] Plaintiff filed a Motion for Summary Judgment (Dkt. No. 14) on September 9, 2019, to which the Commissioner filed a Cross-Motion for Summary Judgment (Dkt. No. 17) on October 7, 2019, along with a Memorandum in Support of Defendant's Motion for Summary Judgment and In Opposition to Plaintiff's Motion for Summary Judgment (Dkt. Nos. 18 and 19). Accordingly, the parties' motions are ripe for disposition. The relevant period for the instant action is between April 9, 2014, the alleged onset date, up to December 31, 2019, the last date on which plaintiff met the insured status requirements of the Social Security Act ("relevant period"). AR at 43. At issue are plaintiff's following impairments: post-traumatic brain injury, mild neurocognitive disorder, chronic headaches, and chronic sinusitis. *Id.* Below is a summary of the relevant medical evidence, state agency opinion evidence, and testimony from the administrative hearing.

     **a.    Relevant Medical Evidence**

The record contains medical evidence from the relevant period from a range of sources, including psychologist visits, neurologist appointments, and a visit to a neuropsychologist.

*Visits to Psychologist*

Plaintiff's visits to her psychologist, Dr. Maha Abdel-Kader, began in March of 2012 while plaintiff was still employed. AR at 308. At these visits, Dr. Abdel-Kader prescribed various

---

[1]     Plaintiff was granted two extensions of time within which to file a civil action. AR at 1.

medications for plaintiff's depression. AR at 306-07, 343-60, 368-71. Dr. Abdel-Kader's records throughout the relevant period note plaintiff's complaints of headaches. AR at 306, 344,45, 352-54. Of particular significance is plaintiff's March 11, 2014 visit, during which she reported to Dr. Abdel-Kader that she had been laid off from her job the day before. AR at 350. Session notes indicate that plaintiff had a depressed mood but that she was calmer than she had been when she first heard the news and planned to collect unemployment benefits. AR at 350.

Plaintiff had two additional appointments over the next six months, during which her mood was low, and she complained of severe migraine headaches. AR at 348-50. Plaintiff returned in February 2015 and reported that she had applied for disability.[2] AR at 347. In May 2015, plaintiff reported recent long-distance travel and appeared to have logical thoughts. AR at 346. By August of 2015, plaintiff's mood had improved, and she demonstrated focus and concentration despite her headaches; the following month her mood was good, and her thought process remained logical. AR at 344-45. Dr. Abdel-Kader's notes from November 2015 indicate that plaintiff was continuing to do well, with a stable mood and controlled depression. AR at 343. In January 2016, plaintiff reported sleeping well, being bored at home, and discussed possible activities with Dr. Abdel-Kader. AR at 371. Subsequent session notes continued to describe plaintiff's mood as improved and noted her logical thought processes. AR at 368-71.

*Visits to Neurologist*

Plaintiff's first recorded visit with her neurologist, Dr. Jon D. Peters, occurred on February 17, 2014. At this appointment, plaintiff reported frequent, intermittent episodes of numbness on the right side of her head with confusion and disorientation. AR at 334. However, Dr. Peters determined that she had normal mental status, normal gait, and normal cranial nerves, motor

---

[2] As noted earlier, plaintiff applied for disability benefits on May 4, 2014, alleging disability beginning April 9, 2014. AR at 88, 99.

function, sensation, and cerebellar testing. AR at 334.

Plaintiff next saw Dr. Peters on March 17, 2014, a week after plaintiff lost her job. At this appointment, Dr. Peters reviewed the results of plaintiff's MRI, CT, and EEG, which were all normal. AR at 335. Plaintiff continued to report subjective complaints, including difficulty concentrating. *Id*. During a visit on April 15, 2014, Dr. Peters indicated that plaintiff was fully disabled from work, although treatment notes from that visit do not clearly indicate the basis for Dr. Peters' opinion. AR at 337. At plaintiff's next appointment on May 5, 2014, Dr. Peters again notes that plaintiff was disabled from employment and recommended that she seek disability. AR at 338. Plaintiff followed up on August 27, 2014, complaining of chronic daily headaches. AR at 341. Dr. Peters reiterated that she was disabled and provided medication for plaintiff's sleep issues and headaches. AR at 341. Plaintiff's next appointment did not occur until January 2015, at which Dr. Peters refilled plaintiff's prescription and filled out disability paperwork. AR at 361.

On March 20, 2015, Dr. Peters indicated that plaintiff had bumped her head on several occasions but had not sought medical attention and showed no physical evidence of injury. AR at 362. Plaintiff reported light sensitivity, problems with balance, and increased headache frequency. *Id.* At plaintiff's appointment in June of 2015, she stated that the weather aggravated her headaches. Her physical examination was unchanged, and Dr. Peters simply refilled her prescription. AR at 363. On September 16, 2015, plaintiff exhibited decreased photosensitivity, and a neurological examination was normal despite reporting frequent headaches. AR at 364. Three months later, on December 16, 2015, Dr. Peters noted that plaintiff was stable, with no changes. AR at 365.

On March 10, 2016, Dr. Peters saw plaintiff and noted that a recent EEG was unremarkable, and an MRI was "possibly" consistent with a new traumatic brain injury. AR at

4

376, 379-382. In August 2016, Dr. Peters gave plaintiff a Botox injection, refilled her prescriptions, and noted that her physical examination remained unchanged. AR at 377-78. Six months later, on March 6, 2017, plaintiff complained of increased difficulties all around, but Dr. Peters found her mental status, gait, and balance to be normal. AR at 52, 375. Over the relevant period, plaintiff saw Dr. Peters with decreasing frequency. Plaintiff saw the neurologist roughly on a monthly basis in 2014, a quarterly basis in 2015, and once or twice per year thereafter. Her prescriptions and treatments throughout this period did not change significantly.

*Neuropsychologist examination*

Plaintiff had one visit with a neuropsychologist, Dr. David Hebda, during the relevant period. AR at 7. Dr. Hebda reviewed plaintiff's subjective complaints as well as her medical history, noting plaintiff's complaints of headaches, sensitivity to lights and sounds, balance problems, and trouble with verbal expression. AR at 315. Dr. Hebda noted, however, that plaintiff's speech was sufficient for conversation exchange and she did not appear to have problems with verbal expression. AR at 317. Plaintiff also complained of a lack of focus and reported that she was trying to relax after her stressful work years. AR at 316. She reported living with her 23-year old son, preparing meals, engaging in cognitive exercises such as Sudoku, and watching a lot of television. AR at 316. Dr. Hebda described plaintiff as pleasant, alert, and cooperative. While plaintiff did appear to be hypersensitive to light, she did seem more comfortable when the lights were dimmed. AR at 317.

Dr. Hebda also administered several tests. AR at 317-19, 321, 324. This testing revealed that plaintiff had intellectual abilities within the borderline impaired range. For example, memory testing was in the borderline impaired range, which suggested skills at a level consistent with occupations that require some high school education. AR at 327. Plaintiff demonstrated no

evidence of learning disabilities concerning any academic skills. AR at 327. Overall, Dr. Hebda's impression of plaintiff was that she had inconsistent intellectual and memory capacities, with strengths in verbal intellectual and memory abilities, and weaknesses in non-verbal skills. AR at 328. Dr. Hebda surmised that plaintiff's cognitive problems were the result of her dive into a shallow swimming pool in 2006. AR at 328. Dr. Hebda recommended that plaintiff quit smoking, use compensatory techniques such as checklists, focus on one task at a time, seek regular feedback, emphasize accuracy over speed, and prepare to work at her current skill level rather than at a higher skill level obtained through hypothetical future improvements to cognition. AR at 329-30.

      **b.     State Agency Consultants' Opinion Evidence**

On July 21, 2014, state agency physician Dr. Chang-Wuk Kang reviewed the record to conduct a mental residual functional capacity assessment. Dr. Kang determined that plaintiff had no restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in concentration, and noted that plaintiff is able to complete workdays and workweeks involving simpler tasking. AR at 95-6. On September 4, 2014, state agency physician Dr. Michael Greenberg reviewed the evidence in the record, including plaintiff's reports of headaches and treatment with medication, and issued his opinion that plaintiff had limited restrictions on her activities of daily living. Dr. Greenberg found that plaintiff had no exertional, postural, manipulative, visual, or communications limitations whatsoever. AR at 94. He did find, however, that plaintiff should avoid all exposure to hazards. Plaintiff asked for reconsideration, and upon review, on January 22, 2015, Dr. Robert Weisberg concurred with the initial assessment, finding that plaintiff had very few limitations, aside from the need to avoid exposure to hazards. AR at 117-18.

    **c.**    **Administrative Hearing**

On March 16, 2017, the ALJ heard testimony from plaintiff, appearing with an attorney, and the VE. AR at 63. At the outset, the ALJ dispensed with some procedural matters, then allowed plaintiff's counsel to make an opening statement. AR at 64. Plaintiff's counsel argued that plaintiff is disabled because of her accident in 2006 during which she sustained a concussion while diving into a swimming pool. Counsel contended that because of this injury, plaintiff has cognitive challenges, sensitivity to light and sounds, and severe migraines with accompanying nausea. AR at 66. Counsel acknowledged that plaintiff is a younger individual based on Social Security standards, but nevertheless argued that based on her limitations, she could not sustain even a sedentary occupation. *Id*.

The ALJ then asked plaintiff a series of questions. Plaintiff began by detailing some preliminary demographic information, such as her date of birth, address, height, and weight. AR at 67. Plaintiff then provided some details abut her daily activities. Plaintiff drives "not very often," most recently a month prior to the hearing. AR at 67. Plaintiff testified that she was a high school graduate and detailed her employment history. While working at the Atlantic Law Group as a legal administrator, plaintiff supervised up to five staff and trained other legal assistants. AR at 69. Plaintiff testified that she lost her job when the firm split up its work and "sent half of it to Michigan," and that she was "unable to work in the office." AR at 70. Plaintiff then testified as to her personal habits, stating that she smoked, did not drink, did not abuse prescription drugs, and did not use illegal drugs. AR at 71. She testified that when she was 22, she "put [herself] in the hospital" for psychiatric reasons. AR at 72. The ALJ then asked plaintiff to describe in her own words what prevented her from working. Plaintiff testified that she experienced near constant migraines, light sensitivity, and sound sensitivity. She testified that she is able to use sunglasses

and hats to help with these symptoms. AR at 73.

Plaintiff's attorney then asked some questions of plaintiff. In response to her counsel's inquiries about her symptoms, plaintiff reiterated that her headaches are nearly constant, that she takes medication for them, including Tramadol, Dilaudid, Skelaxin, and Phenergan during the day, as well as Ativan, Verapamil, and Amitriptyline at night. AR at 74. She reported no side effects from the medications. AR at 74. Counsel also asked her to explain any other reasons plaintiff was unable to work. Plaintiff stated that she was unable to stand for very long and had difficulty showering. AR at 75. Plaintiff's counsel then asked plaintiff why she was no longer able to work, despite employment for many years after her accident in 2006. Plaintiff explained that this was because of her lack of "motor skills" and "training ability." AR at 75. Counsel then asked whether plaintiff could take a job involving less of a need for training and motor skills. Plaintiff testified that she could not, because sometimes "she needs to sit down or lay down," light bothers her, and she sometimes forgets what she is doing. AR at 75. She added that she has trouble remembering people and things. AR at 78. Plaintiff also stated that she experiences fatigue and naps two or three times a day. AR at 76. Plaintiff noted that she is able to vacuum maybe once a month, and cooks less frequently than she used to because of memory issues. AR at 76-77. Plaintiff then went into greater detail about her dizziness and nausea, noting that she vomits "at least once a day" and takes Phenergan to help her eat. AR at 78.

The ALJ then asked plaintiff some additional follow up questions. First, the ALJ asked whether she had sought medical attention to address her sinusitis. Plaintiff testified that she had been to a specialist and "everything came out good." AR at 79. The specialist told her that her hearing in one ear was "a little more sensitive," and that her hearing of high pitches was consistent with her brain injury. AR at 79. The ALJ then asked whether plaintiff had followed

neuropsychologist Dr. Hebda's advice that plaintiff use compensatory techniques to help with memory issues, such as checklists and calendars. AR at 79. Plaintiff said that she had tried to use some of these techniques, but she stopped because she "was getting depressed" about not being able to accomplish tasks. AR at 79.

  The ALJ then heard testimony from the VE, Mr. Edmond Calandra. AR at 80. The VE characterized plaintiff's prior work as a legal assistant as light and skilled work. AR at 80. Similarly, the VE testified that plaintiff's work as a bank teller was classified as light and skilled work. *Id*. The ALJ then asked the VE a series of hypothetical questions. First the ALJ asked the VE to assume a hypothetical person with the same age, education, and work experience as the plaintiff, with the limitation that this person could only have occasional exposure to workplace hazards, occasional exposure to dust, and would be limited to working in a moderate noise environment. The VE testified that such an individual could perform plaintiff's prior work. AR at 81. Such an individual could also perform other jobs at the light, semi-skilled level, such as file clerk, general office clerk, and hotel clerk. AR at 82.

  The ALJ then modified the hypothetical, adding a restriction that the person is also limited to only simple routine and repetitive tasks. The VE testified that such an individual would not be able to perform any of the past work but would be able to perform other jobs in the national economy, such as mail clerk, cafeteria worker, and cashier, which are all unskilled positions. AR at 83. The ALJ then added a further limitation, that such a person would be limited to only occasional interaction with others, and only occasional changes to a routine work setting. The VE testified that such an individual would still be able to perform jobs in the national economy such as mail clerk, as well as light unskilled work such as package sorter and assembler. AR at 84. The VE added that in all positions, a hypothetical individual would not be able to be off task for more

9

than ten percent of a workday and could not exceed eight hours per month of unplanned absences. AR at 84.

Plaintiff's counsel argued in closing that her client would be off task more than 25 percent of the workday due to migraines, having to sleep, and having to be away from light and sound. AR at 85. The ALJ then brought the hearing to a close.

## II.     Standard of Review

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To meet this definition, the claimant must have a severe impairment that makes it impossible to do past relevant work or any other substantial gainful activity ("SGA") that exists in the national economy. *Id.*; *see also Heckler v. Campbell*, 461 U.S. 458, 460 (1983). Determining whether an applicant is eligible for disability benefits under the SSA entails a "five-part inquiry" that "asks: whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medical impairment (or combination of impairments) that are severe; (3) the claimant's medical impairment meets or exceeds the severity of one of the impairments listed in [the SSA's official Listing of Impairments]; (4) the claimant can perform [his] past relevant work; and (5) the claimant can perform other specified types of work." *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). Before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), meaning the most that the claimant can do despite his or her physical or mental limitations. C.F.R. §§ 416.920(h), 416.945(a)(1).

In this case, the ALJ found plaintiff not disabled and denied her application for benefits.

AR at 42. Under the first step, the ALJ found that plaintiff did not engage in any SGA from her alleged onset date of April 9, 2014. *Id.* at 43. At step two, the ALJ determined that plaintiff had the following severe impairments: post traumatic brain injury, mild neurocognitive disorder, chronic headaches, and chronic sinusitis. *Id.* Under the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. *Id.* at 45.

Before proceeding to steps four and five, the ALJ determined plaintiff's RFC. Reviewing the entire record, the ALJ concluded that plaintiff had the RFC to perform a range of simple, routine, and repetitive work with additional environmental, social, and mental limitations, consistent with the hypothetical questioning posed to the VE during the hearing. AR at 48-54. At step four, the ALJ determined that plaintiff was unable to perform her past work as a legal assistant. AR at 54-55. At step five, the ALJ determined that plaintiff was capable of performing other jobs existing in a significant number in the national economy, including the unskilled jobs of mail clerk and package sorter. AR at 55. Based on the foregoing analysis, the ALJ concluded that plaintiff was not disabled as defined by the Act. AR at 56.

In reviewing a decision of the Commissioner, district courts are limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 589.

When evaluating whether the Commissioner's decision is supported by substantial evidence, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1996). "Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Id.* (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)). If supported by substantial evidence, the Commissioner's findings as to any fact are conclusive and must be affirmed. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Although the standard is high, when the ALJ's determination is not supported by substantial evidence on the record or when the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In evaluating whether the ALJ made an error of law, the Fourth Circuit applies a harmless error analysis in the context of social security disability determinations. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015). The harmless error doctrine prevents a remand when the ALJ's decision is "overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" and a remand would be "a waste of time." *Williams v. Berryhill*, 2018 WL 851259, at *8 (E.D. Va. Jan. 18, 2018) (citing *Bishop v. Comm'r of Soc. Sec.*, 583 Fed. App'x 65, 67 (4th Cir. 2014) (per curium)). An ALJ's error may be deemed harmless when a court can conclude on the basis of the ALJ's entire opinion that the error did not substantively prejudice the claimant. *See Lee v. Colvin*, 2016 WL 7404722, at *8 (E.D. Va. Nov. 29, 2016). When reviewing a decision for harmless error, a court must look at "[a]n estimation of the likelihood that the result would have been different." *Morton-Thompson v. Colvin*, 2015 WL 5561210, at *7 (E.D. Va. Aug. 19, 2015) (citing *Shineski v. Sanders*, 556 U.S. 396, 411-12 (2009)).

**III.     Analysis**

Plaintiff argues that the ALJ erred in two respects: her assessment of plaintiff's residual functional capacity and her evaluation of plaintiff's subjective complaints. *See generally* Pl. Br. (Dkt. No. 15) 3-13. Defendant moves for summary judgment on the basis that the ALJ's decision is supported by substantial evidence in the record. *See generally* Def. Opp'n (Dkt. No. 18). For the reasons that follow, the undersigned recommends denying plaintiff's Motion for Summary Judgment, granting defendant's Cross-Motion for Summary Judgment, and affirming the ALJ's decision.

**a.     The ALJ's Assessment of Plaintiff's Residual Functional Capacity**

Plaintiff contends that the ALJ erred in her assessment of plaintiff's residual functional capacity by (1) failing to adequately address plaintiff's migraine headaches and (2) failing to set forth a narrative discussion explaining how the evidence supported each conclusion with citations to specific medical facts and nonmedical evidence.

On the first point, plaintiff contends that the ALJ did not adequately address the frequency and severity of plaintiff's migraine headaches. Specifically, while acknowledging that the ALJ did determine that plaintiff's headaches are a severe impairment (AR at 43), plaintiff argues that the ALJ failed to consider plaintiff's testimony that these headaches occur on a daily basis and are severe enough to require her to lay down and rest, despite medication. (Dkt. No. 15) 6. The record does not support plaintiff's claim. The ALJ explicitly considered plaintiff's testimony that her "headaches last 24 hours" and that she "wakes up with a migraine and is very sensitive to light," and also discussed many of the medical records concerning plaintiff's migraines. AR at 49-50. The ALJ here did exactly what she was supposed to do – she considered plaintiff's complaints about the severity and frequency of these headaches in conjunction with other evidence, such as

unremarkable physical exams, inconsistent photosensitivity, and fairly consistent treatment over a period of years. AR at 51-52. Plaintiff makes a related argument that because the VE stated in the hearing that an individual could not remain off task for more than ten percent of the workday, the ALJ was obligated to explain how an individual with chronic migraines could remain on task for 90 percent of the workday. (Dkt. No. 15) 9. However, an ALJ is not required to adopt a VE's response to a hypothetical, including any off-task limitation unsupported by the record. *Clower v. Colvin*, 2014 WL 199259 at *9 (S.D.W. Va. Jan. 15, 2014). Here, the ALJ did not include an off-task limitation at all, therefore, there was no inconsistency for the ALJ to explain.

On the second point, plaintiff claims that the ALJ failed to set forth a narrative discussion explaining how the evidence supported each conclusion. (Dkt. No. 15) 9. The undersigned finds, to the contrary, that the ALJ's explanations were thorough and clearly connected to the evidence set forth in the opinion. An ALJ is not required to follow a rigid formula, nor does an ALJ need to always perform an explicit function-by-function analysis. *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). What is required is that the ALJ's conclusions be ascertainable from the opinion and supported by the record. *Farrish v. Comm'r of Soc. Sec.*, 2017 WL 1194714, at *9 (W.D. Va. Mar. 30, 2017). Here, the ALJ has more than adequately documented her reasoning and her conclusions are readily ascertainable from the opinion and supported by the record. The ALJ explicitly considered plaintiff's possible limitations, including headaches, sensitivity to light and sound, depression, short-term memory problems, difficulty thinking and concentrating, dizziness, nausea, tiredness, and difficulty handling changes in routine. AR at 49. The ALJ discussed and took into account plaintiff's limitations on daily activities, as evidenced by the restrictions placed on her RFC, such as limitations on the types of tasks and level of interaction in the workplace. AR at 48-50. It is also clear from the opinion why the ALJ did not place any additional limitations on

plaintiff. The ALJ noted that plaintiff continued to work for eight years following her 2006 brain injury. AR at 50. The ALJ also pointed to plaintiff's unremarkable diagnostic tests, including her March 2014 brain scan, a normal brain MRI one week later, and a normal EEG even when she was experiencing symptoms. AR at 50. The ALJ further bolstered her opinion by noting the lack of evidence in neurological and physical exams in 2016, as well as normal mental status and physical tests in 2017, despite plaintiff's complaints. AR at 51-53.

The ALJ also discussed the medical source opinions and explained the weight granted to each one. For instance, the ALJ explained adequately why she granted partial weight to the opinion of neuropsychologist Dr. Hebda. The ALJ noted that a portion of the opinion was based solely on plaintiff's subjective complaints and was inconsistent with Dr. Hebda's own examination, which found plaintiff to be pleasant, alert, cooperative, with no evidence of verbal problems, a careful and reflective style of approach, good frustration tolerance, and ability to accept moderate levels of challenge. AR at 52-53. Because of the specific references to the medical records, and her weighing of the medical opinions and other evidence, it is clear t how the ALJ arrived at the conclusion that she did.

      **b.**      **The ALJ's Evaluation of Plaintiff's Subjective Complaints**

Plaintiff contends that the ALJ erred in her assessment of plaintiff's subjective complaints. Plaintiff alleges that the ALJ failed to adequately explain how she decided which of plaintiff's statements to believe and which to discredit. (Dkt. No. 15) 11. However, no reversible error was committed by the ALJ on this issue.

An ALJ is not obligated to accept, without more, a plaintiff's subjective complaints of disabling pain. *Craig*, 76 F.3d at 591. Here, the ALJ provided a detailed discussion outlining why she did not give full credit to all of plaintiff's subjective complaints. As noted above, the ALJ

articulated that plaintiff had been able to work for eight years without issue after her head injury occurred and that plaintiff stopped working because of changes at her company. AR at 49-50. The ALJ also was clear in her articulation of the objective medical evidence in this case, which included results she could reasonably use to weigh against plaintiff's subjective complaints, such as relatively normal diagnostic tests and examination findings. AR at 50. It is entirely appropriate for an ALJ to consider such objective findings in assessing the severity of a plaintiff's symptoms. *Ross v. Berryhill*, 2019 WL 289101, at *10 (E.D. Va. Jan. 3, 2019). Moreover, as is the case here, it is also appropriate for an ALJ to assess subjective complaints based on gaps in plaintiff's treatment. *Id*. at *6. Despite a conservative course of treatment with no side effects, plaintiff's medical history involves visits of diminishing frequency over the course of three years. AR at 52. The ALJ also explicitly considered plaintiff's activities of daily living in assessing the severity of her impairments. In noting plaintiff's ability to care for pets, do laundry, perform chores, shop, pay bills, drive, do cognitive exercises, go to the movies, and travel out of state, the ALJ presented a self-evident contrast with plaintiff's subjective complaints of constant headaches preventing any sustained employment. The ALJ clearly articulated these facts in her opinion and was entitled to weigh them against plaintiff's subjective complaints.

**IV.     Recommendation**

For the reasons set forth above, the undersigned recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 14) be DENIED, that defendant's Cross-Motion for Summary Judgment (Dkt. No. 17) be GRANTED, and that the final decision of defendant be AFFIRMED.

**V.     Notice**

The parties are notified as follows. Objections to this Report and Recommendation must be filed within fourteen (14) days of service on you of this Report and Recommendation. Failure

to timely file objections to this Report and Recommendation waives appellate review of the substance of the Report and Recommendation and waives appellate review of a judgment based on this Report and Recommendation.

/s/
Michael S. Nachmanoff
United States Magistrate Judge

June 19, 2020
Alexandria, Virginia